IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JOSEPH Q. MIRARCHI LEGAL SERVICES, P.C.,**<br>　　　　　　**Appellant**<br>　　　v.<br><br>**RENEE MARIE THORPE,**<br>　　　　　**Debtor-in-Possess**<br>　　　v.<br>**DALE W. THORPE**<br>　　　　　**Movant**<br><br>**MICHAEL B. JOSEPH**<br>　　　　　**Trustee**<br><br>**UNITED STATES TRUSTEE**<br>　　　　　**Trustee** | **CIVIL ACTION**<br><br><br><br>**NO. 19-3102** |

## MEMORANDUM

Renee and Dale Thorpe hired a law firm, Joseph Q. Mirarchi Legal Services, P.C ("Mirarchi"), to assist them in a lawsuit against their property insurer. The relationship soured, and the Thorpes dismissed Mirarchi. After being dismissed, Mirarchi claimed entitlement to attorney's fees for the services provided up until that point. The fee dispute has made its way from the Bankruptcy Court, to this Court, to the Third Circuit, back to the Bankruptcy Court, and finally, back here. The only remaining question is a calculation of the size of Mirarchi's award.

### I.　　BACKGROUND

#### A. Factual History

The Thorpes initially filed for bankruptcy in 2012. In the ensuing years, they proceeded against multiple entities, reorganized the plan multiple times, and retained multiple lawyers. The extensive history of the bankruptcy proceedings was laid out in detail the first time the matter

1

came before this Court, and need not be revisited.  *See In re Thorpe*, 540 B.R. 552, 555-60 (E.D. Pa. 2015).

In 2014, in the midst of the Thorpes' bankruptcy proceedings, the couple was also pursuing a separate lawsuit against Nationwide, their property insurer.  Their lawyer, Herbert McDuffy, ended his representation before the case concluded.  The Thorpes retained Mirarchi to continue the Nationwide suit.  The parties entered into a contingency fee agreement that provided, in pertinent part, that Mirarchi's compensation "shall be determined as follows: Thirty-Five (35%) of the funds derived by suit or amicable settlement."

On July 15, 2015, Mirarchi was administratively suspended from practicing law in Pennsylvania effective August 14, 2015, because he failed to fulfill one credit-hour of his Continuing Legal Education ("CLE") requirements under Pennsylvania Rule for Continuing Legal Education 111(b).  Mirarchi soon obtained the CLE hour he needed, and the Pennsylvania CLE Board sent Mirarchi a letter on August 28, 2015 acknowledging the completion of his obligations.  The letter also noted that the administrative suspension would not be lifted until certain "form(s) and fee(s)" were sent to the Disciplinary Board.  Mirarchi was not reinstated to active status as an attorney until September 16, 2015.

Mirarchi failed to timely inform the Thorpes of his suspension, and he continued to act as their attorney throughout that time.  On August 25, eleven days after his suspension took effect, Mirarchi engaged in settlement negotiations with Nationwide's counsel on the Thorpes' behalf.  Nationwide offered a figure of $324,729.30.  In mid-September 2015, the Thorpes' bankruptcy counsel began to request details concerning Mirarchi's administrative suspension.  On October 2, Mirarchi sent the Thorpes a letter addressing the issue, claiming that the suspension did not impact his representation of them.  The Thorpes terminated Mirarchi by e-mail on November 23,

2015, without having accepted the Nationwide settlement. The Thorpes rehired McDuffy, who ultimately accepted the Nationwide offer on the Thorpes' behalf without any further negotiation.

### B. Procedural History

In April 2016, the Thorpes entered into a settlement with Lititz Properties, Inc., which held the mortgage on the couple's farm and another property. As part of the settlement, it was ordered that 65 percent of the money from the Nationwide settlement would go to settle Lititz's claim, and the remaining $113,400 would be placed in escrow until the matter of Mirarchi's fees was resolved. If Mirarchi received less than the entire sum, Lititz would be entitled to an additional payment, up to a maximum of $9,400, and any remaining sum would go to the Thorpes.

Mirarchi filed a motion with Bankruptcy Court on June 22, 2016, seeking payment of the disputed funds based on its contingent fee agreement. The Thorpes responded alleging that Mirarchi's misconduct barred recovery for attorney's fees. The Bankruptcy Court, after a three-day hearing, held that Mirarchi had no contractual right to recover the legal fees, and that the wrongful conduct during the Nationwide suit barred it from recovering in equity. *In re Thorpe*, 563 B.R. 576 (Bankr. E.D. Pa. 2017).

On review, this Court reached the same conclusion, holding that the Thorpes had the absolute right to terminate their contract with Mirarchi and as such, Mirarchi could not recover the contingency fee under contract principles. *In re Thorpe*, 2017 WL 3084388, at *4 (E.D. Pa. July 20, 2017). Although a *quantum meruit* award was possible in such a case, it was determined that, because Mirarchi was fired due to his own wrongful acts, *i.e.*, his disbarment and failure to inform his clients, recovery was barred in equity. *Id.* at *5.

On appeal, the Third Circuit affirmed that Mirarchi has no contractual right to recover

fees from the Thorpes.  755 F. App'x 177, 180 (3d Cir. 2018).  But the Circuit disagreed on whether he was entitled to *quantum meruit* recovery, holding that "even were there a material breach, an attorney is not barred completely from recovering in *quantum meruit* in this context."  *Id.*  The Circuit concluded "that the Supreme Court of Pennsylvania would adopt the modern approach to restitution in favor of a breaching party for service contracts, as articulated in § 374 of the Restatement (Second) of Torts."  *Id.* at 180-81 (quoting *Lancellotti v. Thomas*, 491 A.2d 117, 119 (Pa. Super. 1985)).  Section 374 provides that:

> [If] a party justifiably refuses to perform on the ground that his remaining duties of performance have been discharged by the other party's breach, the party in breach is entitled to restitution for any benefit that he has conferred by way of part performance or reliance in excess of the loss that he has caused by his own breach.

The Circuit further concluded that "§ 374 applies in full force to claims by a service provider brought under the label of '*quantum meruit*' given the Pennsylvania Supreme Court's understanding that '[a]n action in quantum meruit sounds in quasi-contract or contract implied in law and seeks the equitable remedy of restitution where one person has been unjustly enriched by the services of another.'"  *Id.* at 181 (citing *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1250 n.4 (2016) ("*Meyer II*")).  For that reason, the Circuit disagreed that Mirarchi's actions precluded recovery in *quantum meruit*, further expressing "some doubt about the sincerity of the Thorpes' claim that [the] brief administrative suspension for missing a single CLE credit was important to them, given that they accepted the very settlement amount he negotiated soon after they terminated him."  *Id.* at 181 & n.2.

Thus the Circuit determined that the primary issue in deciding whether Mirarchi was entitled to an award turned on the equitable doctrine of unclean hands.  *Id.* (citing *In re Estate of*

4

*Pedrick*, 482 A.2d 215 (1984)).  When considering *Estate of Pedrick*, the Circuit noted that in that case, the Pennsylvania Supreme Court "expressly rejected the notion that an attorney's violation of the Pennsylvania ethical rules governing lawyers would automatically trigger the doctrine of unclean hands."  *Id.*  Instead, the Pennsylvania Supreme Court looked at the underlying behavior of the attorney at issue, noting that his conduct was "so far beyond the pale of acceptable attorney behavior, and so harmful to the individuals involved" that his behavior "shock[ed] the conscience" of the court such that he was barred from recovering attorney's fees.  *Id.* at 182 (citing *Estate of Pedrick*, 482 A.2d at 222-23 & n.14).

Against this backdrop, the Circuit evaluated whether Mirarchi acted with unclean hands, finding that while it did "not applaud the manner in which Mirarchi handled his representation of the Thorpes once he was placed on administrative suspension," it did not "believe his conduct shocks the conscience such that he should be completely denied recovery based on the doctrine of unclean hands."  *Id.*  It thus turned to the required showings for a *prima facie* claim for *quantum meruit*, concluding that Mirarchi fulfilled all three showings: he conferred benefits on the Thorpes; those benefits were appreciated by them; and the Thorpes accepted and retained those benefits under such circumstances that it would be inequitable for them to retain them without payment.  *Id.*  That was, the Circuit concluded, as far as it could go at that point: it remanded the case to this Court to "determine in the first instance the proper amount" of recovery.  *Id.*

This Court remanded the case to the Bankruptcy Court to make a recommendation concerning the proper amount of a *quantum meruit* award.  On December 20, 2018, the Bankruptcy Court entered an order requiring:

> [O]n or before January 4, 2019, each party shall file a statement stating whether this court may comply with the requirements of the remand order based on the

> existing evidentiary record or whether it is necessary and/or appropriate for this court to take further evidence on the issue. If a party asserts that further evidence is necessary and/or appropriate, the party [must] state with specificity the reasons for its position.

602 B.R. 906, 911 (Bankr. E.D. Pa. 2019) (quoting Doc. 696). No party filed a timely request to supplement the evidentiary record. On March 18, 2019, the Bankruptcy Court entered another order, this time requesting parties to address "the appropriate legal standards to be applied in determining a *quantum meruit* award in a case in which an attorney's services have been terminated before the right to a contingent fee has vested," and "the proper determination of the *quantum meruit* award based on the facts of this case, with citations to the record (or to the prior findings [of] fact of the district court or the proposed findings of fact of the bankruptcy court) for any facts employed in the analysis." *Id.* Unlike the first order, the latter order "triggered a flurry of filings from the parties that went well beyond the scope of the submissions ordered by the court."[1] *Id.*

    The Bankruptcy Court ultimately concluded that the record supported that Mirarchi expended 22 hours representing the Thorpes, and he had a reasonable hourly rate of $300. *Id.* at 915. To calculate the reasonable compensation, it used the lodestar approach – multiplying the reasonable number of hours expended by a reasonable hourly rate – but then adjusted the award to reflect equitable principles. Namely, the Bankruptcy Court provided an upward adjustment because Mirarchi took Thorpes from a "vulnerable position" to a six-figure settlement, but then reduced that figure to reflect Mirarchi's own misbehavior regarding his suspension. This

---

[1] Mirarchi faults the Bankruptcy Court for failing to mark its untimely memorandum alleging new evidence as "uncontested," thereby incorporating it into the Record. But as Mirarchi argues in the same objection, the Bankruptcy Court clearly did take the memorandum into account in deciding its opinion; in fact, it accepted his proposed hourly fee as reasonable based on arguments made in it. Whether or not the memorandum was marked as uncontested, the Bankruptcy Court was not required to accept all arguments made in it. And even though the memorandum was filed out of time, the Bankruptcy Court still considered and addressed all arguments raised in it.

6

resulted in a recommended award of $25,200.[2] *Id.* at 921. The Bankruptcy Court forwarded the record and its recommendations to this Court.

## II. LEGAL STANDARD

In a non-core proceeding "the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c).

## III. DISCUSSION

The issue presented in this case is a narrow one: what is the amount of fees owed in *quantum meruit* to Mirarchi? But in remanding the matter, the Third Circuit flagged other questions that it thought should be answered as well – namely, whether this action is properly asserted against the Thorpes or against McDuffy, and whether Mirarchi can recover for legal services rendered while he was administratively suspended. *In re Thorpe*, 755 F. App'x at 183 & n.3.

Determining the proper size of the fee award must be guided by § 374 of the Restatement (Second) of Torts. Thus, in calculating Mirarchi's award, it must be ensured that the award provides him compensation "for any benefit that he has conferred by way of part performance or reliance in excess of the loss that he has caused by his own breach." Restatement (Second) of

---

[2] Mirarchi argues that, in reaching these conclusions, the Bankruptcy Court exceeded the Third Circuit's mandate and violated principles of law-of-the-case by going beyond the facts "as streamlined" by the Third Circuit. Such an argument misunderstands the order the Bankruptcy Court was given. While the Circuit concluded that Mirarchi has a viable *quantum meruit* claim, that was "as far as" it could go on appeal – remand was necessary to determine the amount of recovery appropriate. *In re Thorpe*, 755 F. App'x at 183. And so this case was remanded to the Bankruptcy Court with the instruction to make a recommendation on the proper amount for the award. To fulfill its mandate, the Bankruptcy Court had to consider facts beyond those presented to the Third Circuit, as that record was insufficient.

Torts § 374. In effect, the Restatement presents a formula for calculating the recovery: the full value of the services a party provided, minus any losses the party inflicted by his own breach.

Despite the seeming simplicity of calculating a *quantum meruit* award, the Pennsylvania Supreme Court has not provided clear guidance on how to quantify the amount of benefits conferred in the attorney's fees context. Many lower Pennsylvania courts use the standard lodestar approach: multiply the number of hours worked by the attorney's reasonable fee. *See, e.g.*, *Mager v. Bultena*, 797 A.2d 948, 958 (Pa. Super. 2002) (holding that *quantum meruit* compensation "is to be calculated based on the number of hours worked multiplied by a fair fee"); *Hiscott & Robinson v. King*, 626 A.2d 1235, 1238 (Pa. Super. 1993) (same); *Biersdorf & Assocs., P.C. v. Horner*, 2013 WL 10256079, at *5 (Pa. Com. Pl. Sept. 19, 2013) (same). This is the method for which Mirarchi advocates.

Unfortunately, however, a straightforward application of the lodestar approach is not reliable in this case. During the Bankruptcy Court's August 2016 hearing Mirarchi testified that he "didn't keep records [of the time he spent working on the matter] because it was a contingency fee agreement." Nonetheless, in response to the Bankruptcy Court's March 2019 order requesting briefing on the appropriate legal standards (and well after the time in which the Bankruptcy Court had ordered any new evidence be offered), Mirarchi submitted a "File Activity Log." According to Mirarchi, the Log is a summation of record evidence of the hours Mirarchi expended on the matter, excluding time spent while administratively suspended.[3] In it, he asserts that he spent 326.30 hours working on the dispute and that his reasonable hourly fee is $300, for a total lodestar award of $97,890.00.[4] But a review of the record and Mirarchi's own testimony

---

[3] For purposes of considering Mirarchi's Log, his exclusion of time spent working while suspended shall be accepted. This matter is discussed in more detail *infra*.

[4] The Log also contains records of legal expenses related to the fee dispute, including those incurred

8

that he did not keep contemporaneous time records undercuts the reliability of this number. Indeed, the record[5] contains evidence of just 22 hours of work on the matter, excluding time spent while suspended: approximately 13 hours of work opposing Nationwide's motion to dismiss the Thorpes' claim and approximately 8 hours of work later performed to modify the pleadings.[6]

Neither of these numbers can reliably establish the number of hours Mirarchi spent working on the matter for lodestar purposes. Mirarchi's Log is an unverified approximation that he appears to have compiled over four years after he finished working on the case. And because it was submitted after the time in which the Bankruptcy Court allowed for supplemental evidence, the Thorpes were given no opportunity to cross examine or otherwise challenge it.[7] On the other hand, the record on the issue of fees is too sparse to accurately approximate the

---

through Mirarchi's employment of an outside firm for the Third Circuit appeal. Such fees are not recoverable in the pending matter. *Quantum meruit* is intended to compensate Mirarchi only for the services he provided to the Thorpes, not for expenses Mirarchi incurred himself. *See* Restatement (Second) of Torts § 374 (requiring compensation for "any benefit that he has conferred"). The standard "American Rule" is that, in the absence of a contractual or statutory fee shifting provision, each party bears its own legal costs. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 95 (1975). Mirarchi cites no case establishing that the standard rule should not apply presently. In fact, in the primary case on which Mirarchi relies, the fee calculation accepted by the Pennsylvania Supreme Court specifically excluded "charges related to the fee dispute." *Meyer II*, 179 A.3d at 1097.

[5] The primary source of evidence in the record is Mirarchi's "*Nunc Pro Tunc* Application to Employ Joseph Q. Mirarchi Legal Services, P.C. as Special Litigation Counsel." Mirarchi filed this application while bankruptcy court approval of the Thorpe-Nationwide settlement was pending, with the goal of ensuring he would recover his contingency fee from the settlement. In the application, Mirarchi described approximately 21 hours of work he asserted that he performed on the case.

[6] In reaching this conclusion, the Bankruptcy Court's findings of facts are thus adopted.

[7] Mirarchi argues that Federal Rule of Civil Procedure 11, which requires that all pleadings come with a certification that they are not frivolous, baseless, or made for an improper purpose, establishes that the Log is legitimate. Thus, according to Mirarchi, because he certified the Log under Rule 11 there is no threshold verification issue. Rule 11 sets guidelines to "deter abuse of litigation" and "streamline" the process. *In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 97 (3d Cir. 2008). It merely requires certification of the non-frivolousness of a pleading; it does not automatically turn every document a party submits into a verified piece of evidence that must be accepted. And given the discrepancies between the Log, the record, and Mirarchi's testimony, verification concerns persist.

value of the benefits Mirarchi conferred – benefits that included saving the lawsuit from near-dismissal and securing a sizeable settlement that the Thorpes' new lawyer accepted with no further negotiation.

Thus, in order to ensure that Mirarchi is compensated for "any benefit that he has conferred" in excess of any loss he caused, as required by the Second Restatement of Torts, it is necessary to look beyond a pure lodestar. Additionally, a more holistic approach to calculating the fees better comports with the Third Circuit's mandate in this case, which instructed that *quantum meruit* should be approached "under the rubric of unclean hands" and with overarching equitable principles in mind. *In re Thorpe*, 755 F. App'x at 181. This second option for calculating the fees – one that looks to equitable principles beyond the lodestar – has found support in the Pennsylvania Superior Court, first from a concurring opinion which explained that because "a *quantum meruit* action sounds in equity, fairness should prevail. While the remedy in some cases may properly be determined by multiplying the hourly rate by the number of hours worked, other cases may warrant a more comprehensive, fact-specific approach." *Mager*, 797 A.3d at 961 (Joyce, J., concurring). In a more recent case, a majority of the Superior Court adopted that concurrence, noting that "a *quantum meruit* recovery need not be limited to an hours and expenses analysis," and "principles of fairness should prevail." *Angino & Rovner v. Jeffrey R. Lessin & Assocs.*, 131 A.3d 502, 511 (Pa. Super. 2016) (citing *Mager*, 797 A.3d at 961-62 (Joyce, J., concurring)). The Bankruptcy Court in this case, too, used this approach.[8]

---

[8] Mirarchi argues that, in adopting this approach, the Bankruptcy Court failed to follow the binding precedent from the Pennsylvania Supreme Court set forth in *Meyer II*, 179 A.3d 1093, and failed to treat *quantum meruit* as a question of unjust enrichment. But the only issue before the Bankruptcy Court was how to calculate the *size* of the *quantum meruit* award. *Meyer II* addressed the issues of whether an award was warranted in the first instance, and against whom a *quantum meruit* claim should be brought. *Id.* at 1103-04. Thus *Meyer II* was taken into account by the Third Circuit, which answered positively the question of whether an award was appropriate in this case. The Bankruptcy Court did not need to address *Meyer II* to decide the size of the award. And its ultimate approach to calculating the award, which took

It thus next must be determined *how* to calculate an equitable fee award that remains faithful to the Second Restatement's guidance. The Bankruptcy Court offered one potential solution: it looked back to what the contingency fee would have been had Mirarchi not been dismissed. It then reasoned that there are three stages of a proceeding – pleadings, discovery, and trial – and Mirarchi assisted in only one stage (pleadings), so it was entitled to one third of the contractual contingent fee, or $37,800. *In re Thorpe*, 602 B.R. at 919-20. But, because the action sounds in equity and Mirarchi committed professional misconduct, the Bankruptcy Court then reduced the recovery by one third, to result in a fee recovery of $25,200. *Id.* at 921.

Determining the appropriate attorney's fee award, however, requires a more exacting analysis. At the outset, reliance on the contingency fee is of questionable appropriateness – as the Third Circuit held, "a client has a right to terminate his relationship with an attorney at any time, regardless of whether there exists a contract for fees." *In re Thorpe*, 755 F. App'x at 180 (quoting *Meyer II*, 179 A.3d at 1099). And "[n]o Pennsylvania appellate court has ever awarded a proportionate share of a contingency fee to a firm discharged by the client well prior to the occurrence of the contingency, for the simple reason that a client may discharge an attorney at any time, for any reason." *Mager*, 797 A.2d at 958.

Instead, under Pennsylvania law, attorney's fees are to be calculated by taking into account a multitude of factors, including:

> the amount of work performed; the character of the services rendered; the difficulty of the problems involved; the importance of the litigation; the amount of money or value of the property in question; the degree of responsibility incurred; . . . the results he was able to obtain; the ability of the client to pay a reasonable fee for the services rendered; and, very importantly, the amount of money or the value of the property in question.

*In re LaRocca Estate*, 246 A.2d 337, 339 (Pa. 1968).

---

into account equitable principles to determine the amount owed to Mirarchi, was in line with *Meyer II*'s instruction to treat *quantum meruit* like the equitable doctrine of unjust enrichment.

Without a reliable log of hours, it is not possible to wholly accurately estimate the amount of work Mirarchi put into this proceeding. And the two estimates provided – 22 hours or 326.30 hours – are so disparate as to make neither useful. Overall, Mirarchi was employed on this matter for a full year, from November 2014 to November 2015. However, for one month of that time, Mirarchi was administratively suspended and barred from practicing law in the state, a fact of which he did not timely apprise the Thorpes. Thus, at this stage, one of the questions the Third Circuit left open must be addressed: should the time Mirarchi spent working on this matter while he was administratively suspended be included? Mirarchi himself concedes this issue – in compiling his File Activity Log, he "excluded all times in which the administrative suspension was in effect," from August 14, 2015 to September 16, 2015. Such an outcome is just under equitable principles. While Mirarchi's suspension does not warrant barring him from receiving *any* recovery in *quantum meruit*, he cannot escape the fact that his work between August and September 2015, while his license was suspended, constituted the unauthorized practice of law, in violation of the Pennsylvania Rules of Disciplinary Enforcement. *See In re Thorpe*, 755 F. App'x at 182; Pa. R.D.E. 217(j); 42 Pa. C.S.A. § 2534. Had Mirarchi been following Pennsylvania law, he would not have been working during that month. Equity seeks to provide "substantial justice," *Weissman v. Weissman*, 121 A.2d 100, 103 (Pa. 1956), and so the time during which Mirarchi was working without a license cannot count towards the determination of the fees he shall be awarded.[9] Thus eleven months of the work he did for the Thorpes will be taken into account.

---

[9] Related to his suspension, Mirarchi objects to the Bankruptcy Court *denying* the Thorpes' motion for judicial notice of Appellant's temporary disbarment, arguing that even mentioning the suspension in order to deny the motion is "unfair, highly prejudicial, misleading, and irrelevant." The Bankruptcy Court, however, is tasked with responding to the motions before it. The Bankruptcy Court mentioning facts that are established in the record, such as the fact that Appellant's license to practice law was temporarily suspended, even if he is now challenging that decision, is not unduly prejudicial.

Many of the remaining factors, including the character of the services rendered, the importance of the litigation, and the results attained, all involve similar inquiries.  The Thorpes retained Mirarchi in the midst of their bankruptcy proceedings to handle a separate proceeding that was running concurrently in state court, an insurance claim against Nationwide.  When they hired Mirarchi, their lawsuit against Nationwide was in a precarious position.  Preliminary Objections pending against the complaint McDuffy filed could have resulted in total dismissal of the lawsuit, and McDuffy felt he lacked the expertise to overcome the objections and to generally successfully navigate the litigation.  The Thorpes thus retained Mirarchi who, working under considerable time constraints, responded to the Objections and prevented the complaint from being dismissed.  Mirarchi went on to file an amended complaint.  He further convinced Nationwide not to press their Objections, but instead to answer the amended complaint.  Following discovery, Mirarchi negotiated a $324,729.30 settlement with Nationwide – which, following Mirarchi's dismissal and McDuffy's re-hiring, McDuffy accepted on behalf of his clients with no further negotiation.  Mirarchi engaged in the settlement talks, however, while he was barred from practicing law.  Thus his actual negotiation cannot be considered.  But that does not mean all the work he did that put the Thorpes in the position to successfully settle must be ignored.  The substantial work Mirarchi performed before he was suspended permitted the litigation to proceed to discovery, which significantly contributed to the eventual successful outcome of the litigation.  Mirarchi's services thus directly led to the Thorpes going from risking total dismissal of their case to attaining a more than $300,000 settlement.

Moreover, the Nationwide settlement had a value that exceeded its pure numerical scope as well.  While the case was ongoing, the Thorpes were also in mediation discussions with Lititz Properties Inc., which held the mortgage on the Thorpes' farm that was scheduled for a sheriff's

sale. The availability of settlement proceeds was a material factor in inducing Lititz to compromise on its claims against the Thorpes – per the Lititz settlement agreement reached, which was finalized after Mirarchi's dismissal, the Thorpes were to accept the Nationwide settlement and pay Lititz all of the recovery from it except for whatever portion of the settlement was to go towards attorney's fees. The settlement money would represent full satisfaction of Lititiz's claim against the Thorpes. Thus Mirarchi's work securing the Nationwide agreement also provided the Thorpes considerable benefit in that mediation. *See In re LaRocca*, 246 A.2d at 339 (instructing courts determining fees to look at the character of services rendered, the importance of the litigation, and the result obtained).

A final relevant factor for determining the appropriate fees is the ability of the client to pay. *See id.* In this case, the 35 percent of the Nationwide settlement that Mirarchi claimed was its contingency fee was put in escrow pending the resolution of this dispute.[10] The amount that went to Lititz in the settlement satisfied the Thorpes' debt in full. Thus as the money is already in escrow for the purposes of providing for Mirarchi's fees, there is no concern over the Thorpes' ability to pay.

In sum, the Nationwide case proved highly important in allowing the Thorpes to resolve a dispute with their mortgage holder during their bankruptcy proceedings. Mirarchi's preserving of the suit, which the Thorpes' former lawyer felt he could not do, and setting it up for a successful settlement, was thus of a high value to the couple, and he retained a very favorable result. *See In re LaRocca*, 246 A.2d at 339.

But the inquiry does not end here. Two other equitable principles guide the decision: the doctrine of unclean hands, *In re Thorpe*, 755 F. App'x at 181, and the need to avoid windfalls,

---

[10] The Settlement also provided that, were Mirarchi to receive less than the full 35 percent of fees reserved, Lititz would receive an additional payment, up to a maximum of $9,400. The issuing of these funds will be discussed *infra*.

14

*see Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.*, 832 A.2d 501, 508 (Pa. Super. 2003). Turning first to unclean hands. "Equity looks beneath the rigid rules of the law to seek substantial justice." *Weissman*, 121 A.2d at 103. While the Third Circuit held that Mirarchi's violation could not, under unclean hands, bar *all* recover, the Circuit also noted that it did "not applaud the manner in which Mirarchi handled his representation of the Thorpes once he was placed on administrative suspension." *In re Thorpe*, 755 F. App'x at 182. Mirarchi's wrongdoing was not simply in missing a single CLE credit, but also in failing to timely notify his clients of the suspension and continuing to practice law despite being told he had to cease. And so, in determining the benefit Mirarchi conferred above and beyond the loss he himself caused, *see* Restatement (Second) of Torts § 374, Mirarchi's wrongdoing cannot be ignored.

At the same time, neither do the Thorpes enter this proceeding with spotless hands. As the Third Circuit ably put it, there is:

> some doubt about the sincerity of the Thorpes' claim that Mirarchi's brief administrative suspension for missing a single CLE credit was important to them, given that they accepted the very settlement amount he negotiated soon after they terminated him. It appears to us that the Thorpes' claim of interest in Mirarchi's continuing legal education may have been motivated by the significant sum they stood to gain by using his administrative suspension to deny his agreed fees.

*Id.* at 181 n.2. Under the terms of the Lititz agreement, any of the 35 percent contingent fee that did not go to Mirarchi and did not revert to Lititz would go to the Thorpes, thus incentivizing the Thorpes to challenge the value of Mirarchi's work on the case and giving them a potential additional motive for their earlier decision to dismiss him.

This concern ties in with another key guiding principles of equity: the need to avoid providing one party with a windfall of recovery that overcompensates them. *See Temple Univ. Hosp.*, 832 A.2d at 508. Per the terms of the settlement the Thorpes signed with Lititz, the Thorpes themselves were not supposed to receive the money from the Nationwide agreement.

15

And even if Mirarchi was to receive less than his contractual 35 percent, nearly $10,000 was supposed to first go to Lititz. While Mirarchi's handling of his suspension was not admirable, judging by McDuffy's acceptance of the settlement Mirarchi reached with no further negotiation, Mirarchi's behavior did not inflict any meaningful monetary harm on the Thorpes. Awarding the Thorpes a sizeable sum of the escrow funds would thus provide them a windfall of money, compensating them for harms they did not suffer.

Ultimately, when Mirarchi was dismissed, he was just one signature on an otherwise finalized agreement away from his contingency fee being owed to him. While the Thorpes have the absolute right to fire Mirarchi at any time, and for any reason, Mirarchi still must be compensated for the immense benefits he provided the couple, and the Court is mindful to avoid providing the Thorpes with a substantial windfall. But Mirarchi's own unclean hands, and the fact that the contingency fee agreement was terminated, yield that it would be inequitable for him to recover the full fee. "What is a fair and reasonable fee is sometimes a delicate, and at times a difficult question." *In re LaRocca*, 246 A.2d at 548. Taking into account all of these principles, it is determined that Mirarchi is entitled to $104,000. The starting point for the fee calculation is the $324,729.30 settlement the Thorpes reached, following Mirarchi's assistance, with Nationwide. Thirty-five percent, or $113,400, which represents what would have been Mirarchi's contingency fee were he not dismissed, was placed into escrow. From that 35 percent, $9,400 shall be subtracted and that amount will be paid to Lititz, per the Lititz settlement, leaving Mirarchi a final award of $104,000. Such an outcome compensates Mirarchi, accounts for his unclean hands, and avoids a windfall to the Thorpes.

That leaves just one question remaining that the Third Circuit left open: are the Thorpes the appropriate party against whom this action should proceed? In some *quantum meruit* actions

for attorney's fees, courts have determined that the predecessor attorney should seek recovery against the client's *new* lawyer, not the client itself. *See Meyer II*, 179 A.3d at 1105. Such is the case when the new lawyer has already been paid a contingency fee for the work to which the former lawyer contributed. *Id.* Thus the money that may rightfully, in part, belong to the predecessor attorney in now in the hands of the new attorney, and the client is no longer the correct party against whom to proceed. *Id.* That is not an issue in this case. Mirarchi's potential fee was not paid out to McDuffy – it was placed in an escrow account as a result of a settlement agreement the Thorpes reached, pending resolution of this dispute. And McDuffy does not seek any direct payment from the account. Instead, in his arrangement with the Thorpes, he left litigation of the present dispute to his clients. Mirarchi is thus correctly proceeding against the Thorpes, as his potential fee award remains in an escrow account held by Clerk of the Bankruptcy Court as part of the Thorpes' proceeding.

      An appropriate order follows.

**April 27, 2020**                                          **BY THE COURT:**

                                                                     /s/Wendy Beetlestone, J.

                                                                     **WENDY BEETLESTONE**